# EXHIBIT O

Westlaw.                                                                    **News**Room

8/1/05 CHISUN 41                                                            Page 1

8/1/05 Chi. **Sun-Times** 41
2005 WLNR 13725162

**Chicago Sun Times** (IL)
Copyright 2005 ProQuest Information and Learning Company; All Rights Reserved.

**August 1, 2005**

Section: Editorials

The allegation against me is so incorrect I feel constrained to reply.

Robert **Novak**

Ex-CIA official's remark is wrong

A statement attributed to the former CIA spokesman indicating that I deliberately disregarded what he told me in writing my 2003 column about Joseph Wilson's wife is just plain wrong.

Though frustrated, I have followed the advice of my attorneys and written almost nothing about the CIA leak over two years because of a criminal investigation by a federal special prosecutor. The lawyers also urged me not to write this. But the allegation against me is so patently incorrect and so abuses my integrity as a journalist that I feel constrained to reply.

In the course of a front-page story in last Wednesday's Washington Post, Walter Pincus and Jim VandeHei quoted ex-CIA spokesman Bill Harlow describing his testimony to the grand jury. In response to my question about Valerie Plame Wilson's role in former ambassador Wilson's trip to Niger, Harlow told me she "had not authorized the mission." Harlow was quoted as later saying to me "the story **Novak** had related to him was wrong."

This gave the impression that I ignored an official's statement that I had the facts wrong but wrote it anyway for the sake of publishing the story. That would be inexcusable for any journalist and particularly a veteran of 48 years in Washington. The truth is otherwise, and that is why I feel compelled to write this column.

My column of July 14, 2003, asked why the CIA in 2002 sent Wilson, a critic of President Bush, to Niger to investigate an Italian intelligence report of attempted Iraqi uranium purchases. All the subsequent furor was caused by three sentences in the sixth paragraph:

"Wilson never worked for the CIA, but his wife, Valerie Plame, is an agency

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

8/1/05 CHISUN 41                                                              Page 2

operative on weapons of mass destruction. Two senior administration officials told
me that Wilson's wife suggested sending him to Niger to investigate the Italian
report. The CIA [Harlow] says its counter-proliferation officials selected Wilson
and asked his wife to contact him."

There never was any question of me talking about Mrs. Wilson "authorizing." I
was told she "suggested" the mission, and that is what I asked Harlow. His denial
was contradicted in July 2004 by a unanimous Senate Intelligence Committee report.
The report said Wilson's wife "suggested his name for the trip." It cited an
internal CIA memo from her saying "my husband has good relations" with officials
in Niger and "lots of French contacts," adding they "could possibly shed light on
this sort of activity." A State Department analyst told the committee that Mrs.
Wilson "had the idea" of sending Wilson to Africa.

So, what was "wrong" with my column as Harlow claimed? There was nothing
incorrect. He told the Post reporters he had "warned" me that if I "did write
about it her name should not be revealed." That is meaningless. Once it was
determined that Wilson's wife suggested the mission, she could be identified as
"Valerie Plame" by reading her husband's entry in "Who's Who in America."

Harlow said to the Post that he did not tell me Mrs. Wilson "was undercover
because that was classified." What he did say was, as I reported in a previous
column, "she probably never again would be given a foreign assignment but that
exposure of her name might cause 'difficulties.' " According to CIA sources, she
was brought home from foreign assignments in 1997, when agency officials feared
she had been "outed" by the traitor Aldrich Ames.

I have previously said that I never would have written those sentences if
Harlow, then-CIA Director George Tenet or anybody else from the agency had told me
that Valerie Plame Wilson's disclosure would endanger herself or anybody.

The recent first disclosure of secret grand jury testimony set off a news media
feeding frenzy centered on this obscure case. Joseph Wilson was discarded a year
ago by the Kerry presidential campaign after the Senate committee reported much of
what he said "had no basis in fact." The re-emerged Wilson is now accusing the
senators of "smearing" him. I eagerly await the end of this investigation when I
may be able to correct other misinformation about me and the case.

                          ---- INDEX REFERENCES ----

COMPANY: WILSON

REGION:  (Africa (1AF90); Niger (1NI25); West Africa (1WE48))

Language:  EN

OTHER INDEXING:  (CIA; **NOVAK**; POST; SENATE; SENATE INTELLIGENCE COMMITTEE; STATE
DEPARTMENT; VALERIE PLAME; VALERIE PLAME WILSON; WILSON)  (Aldrich Ames; Bill
Harlow; Bush; George Tenet; Harlow; Jim VandeHei; Joseph Wilson; Wilson)

KEYWORDS: Joseph Wilson; CIA (COMMENTARY);  (NATIONAL GOVERNMENT);  (CRIME)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT P

*Ambassador*
# Joseph Wilson

A DIPLOMAT'S MEMOIR

# *The* Politics *of* Truth

**Inside the Lies that Led to War
and Betrayed My Wife's CIA Identity**



**AVALON**
publishing group incorporated

**THE POLITICS OF TRUTH**
*Inside the Lies that Led to War and Betrayed My Wife's CIA Identity*
*A Diplomat's Memoir*

Carroll & Graf Publishers
An Imprint of Avalon Publishing Group Inc.
245 West 17th Street · 11th Floor
New York, NY 10011

Copyright © 2004 by Joseph C. Wilson

Excerpts from *The Complete Poems of Cavafy,* copyright © 1961 and
renewed 1989 by Rae Dalven, reprinted by permission of Harcourt, Inc.

All photographs courtesy of the author's collection.

First Carroll & Graf edition 2004
2nd prinitng April 2004

All rights reserved. No part of this book may be reproduced in whole or in part
without written permission from the publisher, except by reviewers who may quote
brief excerpts in connection with a review in a newspaper, magazine, or electronic
publication; nor may any part of this book be reproduced, stored in a retrieval
system, or transmitted in any form or by any means electronic, mechanical,
photocopying, recording, or other, without written permission from the publisher.

Library of Congress Cataloging-in-Publication Data is available.

ISBN: 0-7867-1378-X

Maps designed by Mike Morgenfeld and Suzanne Service
Book design by Simon M. Sullivan

Printed in the United States of America
Distributed by Publishers Group West

Baghdad to care for them. "Whatever their feelings about the U.S. government, the Iraqis, or their own companies, they were uniformly complimentary about what you and your staff did to save their lives, and to a man they asked that I contact you and send you their warmest regards," he told me.

Now Rich wanted to profile me regarding my work during the first Gulf War. When he called, I told him that I'd welcome a profile, because an op-ed piece detailing my trip to Niger would be appearing in a Sunday edition of the *New York Times*. He knew about the trip, as his *Post* colleague Walter Pincus was one of the journalists I had spoken to on background in the months since the president's sixteen words. I thought that a separate article in the *Post* would complement my own piece by helping to establish who I was and what I had accomplished in my career. When Rich learned that my piece would be published in the *Times* on July 6, he offered to interview me immediately so the story could run the same day as the op-ed in the *Times*.

Rich came to our house the same evening and met Valerie in her guise as an energy consultant. He played with my naked twins (he also has twins) and watched my mother-in-law energetically helping us get the house ready for our annual Fourth of July party the next night. Despite the chaos, he managed to get the material he needed for the article, as well as a lot of additional material that he would later discover he could use for a piece on Valerie when her true employment became public knowledge.

On July 6, 2003, the *New York Times* published "What I Didn't Find in Africa." The night before, at about 10:30 P.M., the piece hit the *New York Times* Web site. At 10:32 P.M., I received a call from a *New York Post* reporter looking for a quote from me. At 10:34 P.M. a producer for *Meet the Press* called to invite me on the show the next morning to defend my article. To sweeten the offer, she told me that I would be leading off the program and would be followed by

334                            *Joseph Wilson*

Republican Senator John Warner and Democratic Senator Carl
Levin, both of whom had just returned from Iraq. I agreed, took the
phone off the hook, and went to bed.

The path to writing the op-ed piece had been straightforward in
my own mind. My government had refused to address the funda-
mental question of how the lie regarding Saddam's supposed attempt
to purchase African uranium had found its way into the State of the
Union address. Time after time during the previous four months,
from March to July, administration spokespeople had sloughed off the
reality that the president of the United States had sent our country to
war in order to defend us against the threat of the "mushroom cloud"
when they knew, as I did, that at least one of the two "facts" under-
pinning the case was not a fact at all. It was disinformation. It had
never occurred to me to keep quiet about this. Until the issue was
addressed seriously, I felt obliged to keep raising it. In the end, when
it became clear to me that my name was about to emerge in the public
domain, I *had* to raise it, publicly and in my own words. I realized that
my credibility would be called into question, and I was steeled for
that. But, whatever one might say about me—and there is a lot—the
truth remained: *There was never any evidence of Iraqi uranium pur-
chases from Niger.*

Before I left for the NBC studios that Sunday morning, Valerie
straightened my tie, brushed the lint off my suit, and reminded me, as
only a wife could, that *Meet the Press* was not just the major leagues of
news programs, it was the World Series. I needed to be at the top of
my game.

With resolve I arrived at the NBC green room, where I waited with
Senator Warner; David Broder, the venerable *Washington Post* polit-
ical reporter; Elisabeth Bumiller from the *New York Times;* and the
syndicated columnist Robert Novak. As Senator Warner and I walked
onto the set, we discussed the crisis in Liberia and whether we should
send American forces to restore order there.

increasingly concerned over what else might be put out about her. I assumed, though, that the CIA would itself quash any article that made reference to Valerie. While not yet familiar with the specifics of the Intelligence Identities Protection Act, I knew that protection of the identity of agents in our clandestine service was the highest priority, and well understood by the experienced press corps in Washington. Novak had still been trolling for sources when we spoke on the telephone, so I assumed that he did not have the confirmations he would need from the CIA to publish the story. I told Valerie, who alerted the press liaison at the CIA, and we were left with the reasonable expectation that any reference to her would be dropped, since he would have no way of confirming the information—unless, of course, he got confirmations from another part of the government, such as the White House.

Quite apart from the matter of her employment, the assertion that Valerie had played any substantive role in the decision to ask me to go to Niger was false on the face of it. Anyone who knows anything about the government bureaucracy knows that public servants go to great lengths to avoid nepotism or any appearance of it. Family members are expressly forbidden from accepting employment that places them in any direct professional relationship, even once or twice removed. Absurd as these lengths may seem, a supervisor literally cannot even supervise the supervisor of the supervisor of another family member without high-level approval. Valerie could not have stood in the chain of command had she tried to. Dick Cheney might be able to find a way to appoint one of his daughters to a key decision-making position in the State Department's Middle East Bureau, as he did; but Valerie could not—and would not if she could—have had anything to do with the CIA decision to ask me to travel to Niamey.

The publication of the article marked a turning point in our lives. There was no possibility of Valerie recovering her former life. She would never be able to regain the anonymity and secrecy that her professional life had required; she would not be able to return to her

# EXHIBIT Q

Advertisement



**washingtonpost.com**

# Prosecutor In CIA Leak Case Casting A Wide Net

### White House Effort To Discredit Critic Examined in Detail

By Walter Pincus and Jim VandeHei
Washington Post Staff Writers
Wednesday, July 27, 2005; A01

Advertisement



Bumrungrad Hospital went paperless.

The special prosecutor in the CIA leak probe has interviewed a wider range of administration officials than was previously known, part of an effort to determine whether anyone broke laws during a White House effort two years ago to discredit allegations that President Bush used faulty intelligence to justify the Iraq war, according to several officials familiar with the case.

Prosecutors have questioned former CIA director George J. Tenet and deputy director John E. McLaughlin, former CIA spokesman Bill Harlow, State Department officials, and even a stranger who approached columnist Robert D. Novak on the street.

In doing so, special prosecutor Patrick J. Fitzgerald has asked not only about how CIA operative Valerie Plame's name was leaked but also how the administration went about shifting responsibility from the White House to the CIA for having included 16 words in the 2003 State of the Union address about Iraqi efforts to acquire uranium from Africa, an assertion that was later disputed.

Most of the questioning of CIA and State Department officials took place in 2004, the sources said.

It remains unclear whether Fitzgerald uncovered any wrongdoing in this or any other portion of his nearly 18-month investigation. All that is known at this point are the names of some people he has interviewed, what questions he has asked and whom he has focused on.

Fitzgerald began his probe in December 2003 to determine whether any government official knowingly leaked Plame's identity as a CIA employee to the media. Plame's husband, former ambassador Joseph C. Wilson IV, has said his wife's career was ruined in retaliation for his public criticism of Bush. In a 2002 trip to Niger at the request of the CIA, Wilson found no evidence to support allegations that Iraq was seeking uranium from that African country and reported back to the agency in February 2002. But nearly a year later, Bush asserted in his State of the Union speech that Iraq had sought uranium from Africa, attributing it to British, not U.S., intelligence.

Fitzgerald has said in court that he had completed most of his investigation at a time when he was pressing for New York Times reporter Judith Miller to testify about any conversations she had with a specific administration official about Plame during the week before Plame's identity was revealed.

Miller, who never wrote a story about the matter, is in jail for refusing to comply with a court order to testify. Court records show Fitzgerald is seeking information about communications she had with the Bush official between July 6 and July 13, 2003, when the White House was attempting to discredit Wilson and his allegations.

Fitzgerald appears to believe that Miller's conversations may help him get to the bottom of the leak and the damage-control campaign undertaken by senior Bush officials that week.

Using background conversations with at least three journalists and other means, Bush officials attacked Wilson's

credibility. They said that his 2002 trip to Niger was a boondoggle arranged by his wife, but CIA officials say that is incorrect. One reason for the confusion about Plame's role is that she had arranged a trip for him to Niger three years earlier on an unrelated matter, CIA officials told The Washington Post.

Miller's role remains one of many mysteries in the leak probe. It is unclear whom, if anyone, she spoke to about Plame, and why she emerged as a central figure in the probe despite never having written a story about the case. Also murky is the role of Novak, who first publicly identified Plame in a syndicated column published July 14, 2003.

Lawyers have confirmed that Novak discussed Plame with White House senior adviser Karl Rove four or more days before the column identifying her ran. But the identity of another "administration" source cited in the column is still unknown. Rove's attorney has said Rove did not identify Plame to Novak.

In a strange twist in the investigation, the grand jury -- acting on a tip from Wilson -- has questioned a person who approached Novak on Pennsylvania Avenue on July 8, 2003, six days before his column appeared in The Post and other publications, Wilson said in an interview. The person, whom Wilson declined to identify to The Post, asked Novak about the "yellow cake" uranium matter and then about Wilson, Wilson said. He first revealed that conversation in a book he wrote last year. In the book, he said that he tried to reach Novak on July 8, and that they finally connected on July 10. In that conversation, Wilson said that he did not confirm his wife worked for the CIA but that Novak told him he had obtained the information from a "CIA source."

Novak told the person that Wilson's wife worked for the CIA as a specialist in weapons of mass destruction and had arranged her husband's trip to Niger, Wilson said. Unknown to Novak, the person was a friend of Wilson and reported the conversation to him, Wilson said.

Novak and his attorney, James Hamilton, have declined to discuss the investigation, as has Fitzgerald.

Harlow, the former CIA spokesman, said in an interview yesterday that he testified last year before a grand jury about conversations he had with Novak at least three days before the column was published. He said he warned Novak, in the strongest terms he was permitted to use without revealing classified information, that Wilson's wife had not authorized the mission and that if he did write about it, her name should not be revealed.

Harlow said that after Novak's call, he checked Plame's status and confirmed that she was an undercover operative. He said he called Novak back to repeat that the story Novak had related to him was wrong and that Plame's name should not be used. But he did not tell Novak directly that she was undercover because that was classified.

In a column published Oct. 1, 2003, Novak wrote that the CIA official he spoke to "asked me not to use her name, saying she probably never again will be given a foreign assignment but that exposure of her name might cause 'difficulties' if she travels abroad. He never suggested to me that Wilson's wife or anybody else would be endangered. If he had, I would not have used her name."

Harlow was also involved in the larger internal administration battle over who would be held responsible for Bush using the disputed charge about the Iraq-Niger connection as part of the war argument. Based on the questions they have been asked, people involved in the case believe that Fitzgerald looked into this bureaucratic fight because the effort to discredit Wilson was part of the larger campaign to distance Bush from the Niger controversy.

Wilson unleashed an attack on Bush's claim on July 6, 2003, appearing on NBC's "Meet the Press," in an interview in The Post and writing his own op-ed article in the New York Times, in which he accused the president of "twisting" intelligence.

Behind the scenes, the White House responded with twin attacks: one on Wilson and the other on the CIA, which it wanted to take the blame for allowing the 16 words to remain in Bush's speech. As part of this effort, then-deputy national security adviser Stephen J. Hadley spoke with Tenet during the week about clearing up CIA responsibility for

the 16 words, even though both knew the agency did not think Iraq was seeking uranium from Niger, according to a person familiar with the conversation. Tenet was interviewed by prosecutors, but it is not clear whether he appeared before the grand jury, a former CIA official said.

On July 9, Tenet and top aides began to draft a statement over two days that ultimately said it was "a mistake" for the CIA to have permitted the 16 words about uranium to remain in Bush's speech. He said the information "did not rise to the level of certainty which should be required for presidential speeches, and the CIA should have ensured that it was removed."

A former senior CIA official said yesterday that Tenet's statement was drafted within the agency and was shown only to Hadley on July 10 to get White House input. Only a few minor changes were accepted before it was released on July 11, this former official said. He took issue with a New York Times report last week that said Rove and Vice President Cheney's chief of staff, I. Lewis "Scooter" Libby, had a role in Tenet's statement.

The prosecutors have talked to State Department officials to determine what role a classified memo including two sentences about Plame's role in Wilson's Niger trip played in the damage-control campaign.

People familiar with this part of the probe provided new details about the memo, including that it was then-Deputy Secretary of State Richard L. Armitage who requested it the day Wilson went public and asked that a copy be sent to then-Secretary of State Colin L. Powell to take with him on a trip to Africa the next day. Bush and several top aides were on that trip. Carl W. Ford Jr., who was director of the Bureau of Intelligence and Research at the time and who supervised the original production of the memo, has appeared before the grand jury, a former State Department official said.

© 2005 The Washington Post Company

Ads by Google

**Stop "Living With War"**
Join Neil Young and 500,000 Americans who want peace in Iraq.
neilyoung.truemajorityaction.org

**Haven from Liberal Media**
Share your favorite conservative news and blogs with the world
www.jazznoodle.com

**Hottest Diet in USA**
Lose 20 lbs in 3 weeks! As seen on Oprah & 60 Minutes.
www.WulongforLife.com

# EXHIBIT R

# Judith Miller .org

**News**    **Bio**    **Books**    **Articles**    **First Amendment**    **How to Help**    **Contact**



**Judith Miller is a former reporter for The New York Times and author of four books on the Middle East, biological weapons and the Holocaust. For information on her prosecution for refusing to reveal sources to federal prosecutors, see the** news section **of this Web site or the** Reporters Committee for Freedom of the Press.

**News**

**In this section:**

• Reporting on mobile labs

• Memo on Italian award

• N.Y. Observer article on WMD

• Miller Presses for Shield Law, Gets Warm Ovation in Vegas

• Famed attorney calls for shield laws

• Judith Miller's Farewell

• Bill Keller's Letter to

## Reporting on mobile labs

To those interested in pre-war WMD intelligence on Iraq, here are three stories that I wrote, or co-wrote, about the issue of Iraq's alleged mobile biological labs.

**Aftereffects: The Hunt for Evidence**, May 10, 2003

**Aftereffects: Germ Weapons**, May 21, 2003

**Some Analysts Of Iraq Trailers Reject Germ Use**, June 7, 2003

Each was an exclusive. The three together reflected my reporting on the ground in Iraq and in Washington as doubts among experts grew about the discovery of the trailers in Iraq. All three were published in The New York Times. I think they show that the answer to insufficient reporting, or a story that is wrong, is more reporting, preferably by the reporter who wrote the first story. I regret that in other instances, the Times did not permit me to report on the growing doubts about WMD intelligence in other areas as well.

Judy Miller

Posted by Joshua Tanzer | April 13, 2006

## Memo on Italian award

**Viareggio, Italy, Nov. 29, 2005**

Hello friends:

I have just returned from Italy where the Unione Nazionale Cronisti Italiani, UNCI, Italy's largest union representing some 2,000 news reporters and editors, honored me for helping to preserve a free press by spending 85 days in jail to protect the confidentiality of sources.

On Monday, I traveled to the beautiful seaside town of Viareggio, in Tuscany, to accept the tribute at UNCI's annual meeting, which was attended by almost 200 reporters and editors from throughout Italy. UNCI is Italy's the most important union for news reporters and editors in print, radio,

the end of an interview with Mr. Libby. It is not embedded in any other interview. I spoke to dozens of people when I returned from Iraq about a wide variety of WMD topics that I wrote about. I was not at all focused on the Wilson story and certainly had no idea that two years later Wilson's wife would be at the center of a major political scandal and grand jury investigation. I cannot specifically recall having discussed Mr. Wilson's wife with anyone other than Mr. Libby. No other sources on that subject are cited in my notes. But there were people with whom I discussed sensitive information for stories on other subjects that The Times did publish, and unless Mr. Fitzgerald had agreed to focus his questions to me on Mr. Libby and the Plame/Wilson affair, I could not have testified.

Why did you agree to change the attribution of Scooter Libby for a story?

5) I never did, and never would have identified Scooter Libby in print as a "former Hill staffer." Mr. Libby has never been identified in any story I have written as anything other than a "senior Administration official." While I was prepared to listen to what he had to say based on that attribution, I would have attempted to confirm the information he was providing through other sources, preferably on the record, or gone back to him to renegotiate a more appropriate attribution had I decided to write a story.

What was your assignment in Iraq and did you have access to secret information that was not shared with readers?

6) As part of my assignment with the soldiers who were hunting for weapons of mass destruction in Iraq, I regularly had access to secret information. As a condition of this assignment, like other reporters embedded in sensitive posts, I signed a non-disclosure agreement which gave the military authorization to screen copy I wrote to prevent the disclosure of sensitive sources and methods. Because senior officers of the Exploitation Task Force were so concerned that this sensitive information not be casually discussed in my newsroom, I assured them that I would limit discussions of the most sensitive intelligence sources and methods to senior news executives. Reporters like me remained bound by these commitments after their embeds ended. Unlike many other newspapers and reporters, the Times and I noted the existence of such agreements in stories whose publication had been delayed by military review.

Posted by Judith Miller | November 09, 2005

# Letter to Maureen Dowd

October 23, 2005

Dear Maureen,

I'm glad you always liked me. But in the interests of journalistic accuracy at a very sensitive time for The Times and for me, I wish you had checked some of these damaging assertions about me before you printed them. If you had, there are seven specific mistakes you could have avoided. As important, you could have avoided creating a false and damaging impression that I had tried to cover up for a crime, or that I had convenient memory lapses at the behest of the administration. Just to remind you, I never went to see Scooter Libby to hear character assassination against Joe Wilson. I was trying to get to the bottom of the intelligence failures that were very important to me because they had led to my publishing several incorrect stories based on that intelligence. As my Sunday story stated, the question I put to Libby was this: "was the intell slanted?" The Joe Wilson discussion that day, and in subsequent interviews, was a small part of a much larger story I was trying to understand and tell so that I could offer readers who had trusted my earlier reporting, and whom I wanted to trust my future reporting, a more complete account of what had gone wrong in U.S. policy and intelligence.

As for the specific errors in your story, they include the following: First, I never intended to, nor did I mislead Phil Taubman, as I told both Barney Calame, the public editor, whom I asked to post my responses on his website, and Bill Keller, as Kit Seelye reported in her story today. To recap our Sunday story, Phil asked a group of reporters in the fall of 2003 whether we thought any of us had been targeted by the Administration as part of a deliberate campaign to put out information about Wilson's wife. I was unaware that any such campaign existed, and if it did, that I did not think that I had been a target of it. That is one of the key issues that the special prosecutor has been trying to resolve for the past two years.

Two, it is completely untrue, as you say in your reference to me as badly needing a "leash," that I was an insubordinate, self-assigning reporter who kept "drifting back" into areas from which I was barred. I kept writing about Iraq and weapons because I was assigned to cover the Oil for Food scandal, which involved both Iraq and unconventional weapons, and to cover counter-terrorism efforts in New York, which also involved both topics. Bill Keller and your close friend, Jill Abramson, approved both of those multi-story assignments.

Three, as I also told Calame, Scooter Libby has never been identified in any of my stories as anything other than a "senior Administration official," and never would have been identified

in print in one of my stories in any other way. I accepted the attribution for the sole purposes of listening to the information, not publishing it. While I was prepared to listen to what he had to say based on that attribution, I would have attempted to confirm the information he was providing through other sources, preferably on the record, or gone back to him to renegotiate a more appropriate attribution had I decided to write a story.

Four, I did urge a senior editor to let me pursue a story on Wilson/Plame. As I told the grand jury under oath, I had proposed soon after my breakfast meeting with Libby on July 8th that the paper try to find out whether what Libby was saying was true or whether it was a potential smear of a whistleblower. I said I had felt strongly that because Joe Wilson's op-ed column had appeared in our paper, we had a particular obligation to do so. I never identified the editor to the grand jury or publicly, since it involved internal NYTimes decisions. But since you did, yes, the editor was Jill Abramson. Obviously, Jill and I have different memories of what happened during that turbulent period at the paper. I gave my recollection under oath.

Five, I have already addressed the "Valerie Flame" issue publicly in my answers to reporters at the Senate hearing on the shield law. And again, as I told Calame, "more than two years later, I cannot remember when or why I wrote that misspelled name in my notes. The name is free-floating, separated by two pages from the end of an interview with Mr. Libby and written in a different color ink from my Libby interviews. It is not embedded in any other interview. I spoke to dozens of people when I returned from Iraq about a wide variety of WMD topics that I did write about. I don't know why you and Tina doubt my word, but you should know that I gave this account under oath as well.

Six, the Associated Press story which you cited is untrue. While A.P. did not call to check, you might have. It is true that the special prosecutor asked about whether I had had an earlier meeting with Mr. Libby in June. But as I testified, the discovery of the notebook was prompted by an entirely different matter the special prosecutor had raised. Once again, I found the notebook, which was not covered by the subpoena, as I was searching for additional notes on where I was when I conducted my July 12th interview with Libby. As I told Calame, "Under oath, I had promised the special counsel I would search for any additional notes I might have relevant to Mr. Libby and Plame/Wilson that would clarify whether the notes had been taken in a taxi in D.C. or at my home in Sag Harbor. On my first evening back at the Times while I was on the phone with my lawyer, Bob Bennett, I came upon the notebook as I was looking through a shopping bag filled with

Case 1:06-mc-00125-RBW   Document 4-3   Filed 09/01/2006   Page 9 of 34

notebooks kept under my computer beneath my desk. I discovered that it contained an interview in June with Mr. Libby…I told Bob Bennett what I had found, and he immediately informed the special prosecutor."

Seven, as far as "nailing me to a chair to extract the entire story of my escapade," my lawyers tell me that senior management of the Times, including Bill Keller, were briefed on all important aspects of this case where I was concerned. I held nothing back at such meetings and answered all questions they put to me. I remember that Bill attended several of these sessions.

I agree with you that reporters must be more than stenographers. The same is true of columnists. I hope you will correct the record soon.
Judy

Posted by Judith Miller | November 09, 2005

# EXHIBIT S

# VANITY FAIR.com.

# Lies and Consequences: Sixteen Words That Changed the World

**BY MARIE BRENNER**

With 16 words in his 2003 State of the Union speech—the claim that Saddam Hussein had tried to buy uranium—President Bush not only started a war, he triggered a showdown over freedom of the press. Here is the untold story of "Plamegate": how the media lost one of its most fundamental protections

*The British government has learned that Saddam Hussein recently sought significant quantities of uranium from Africa.* —George W. Bush, State of the Union address, January 28, 2003.

*What has been the impact of the Fitzgerald investigation on the American press? Prosecutors now feel empowered to go after reporters when they may have at least thought about it more carefully in the past. Now I am hearing reporters say for the first time, "Well, maybe if our sources are manipulating us for political reasons, it is O.K. to identify them." We haven't had this many subpoenas since the Nixon years.... My whole staff is working on this issue 24-7.* —Lucy Dalglish, the Reporters Committee for Freedom of the Press, February 15, 2006.

## I. THE SCRIMSHAW ARTISTS
**March 15, 2003, Washington**

"I have doubts," Walter Pincus told Bob Woodward in the newsroom of *The Washington Post* that Saturday. "I am hearing they may not exist."

Pincus braced himself for the invariable Woodward response when he was about to disagree with a friend: *I would be careful with that.* His tone was often custodial, and he could sound condescending, as if he alone were in possession of all the facts. At 59, Woodward, the son of a judge, had the decency of a Dodsworth, but he often behaved as if he were surrounded by stones. His conversation carried the implication of inside information.

All winter long, Pincus, who knew more about weapons and defense systems than almost any other reporter in the capital, and Woodward, his longtime colleague, had been going around and around with each other on the subject of Iraq's weapons of mass destruction, or W.M.D. In the 70s, Woodward and Carl Bernstein had helped topple the Nixon presidency, and since then Woodward had reached the stage of importance where his sources often came to *him.* But as Washington prepared for war, Pincus and Woodward were sifting and resifting what they heard from their sources at the State Department, the Pentagon, the White House, and the C.I.A. It was a time when reporters were chasing shadows on a screen. Both men would soon come to know more about the overarching power of the White House Iraq Group, the president's policies to sell the war, and the machinery behind the campaign to inflate Ahmad Chalabi, the head of the Iraqi National Congress.

Now Pincus had written the first draft of a story that stated in the strongest terms he was capable of that the W.M.D. claim was not supported by any real evidence. He spent that Saturday making a desperate attempt to convince an editor on the national desk of the rightness of the article and trying to persuade him to push it into the Sunday edition.

"I have a piece that casts doubt on this whole thing," Pincus told Woodward.

"What whole thing?"

"The weapons. I am picking up all over the place that there *are* no weapons," Pincus said, and girded himself for the usual Woodward response.

But Woodward startled him. "I am picking that up, too," he said.

"You are?"

"Yes," Woodward said. "There seem to be real doubts now. Let me see what you have written and let's see if we can get it into the paper."

Both Pincus and Woodward maintained a fierce attachment to the reporters' code they had learned as apprentices. They shared a clear understanding of the importance of objectivity, the rules governing the use of anonymous sources, the grid of required confirmations and denials, and the need to guarantee sources the protection of confidentiality.

Pincus at 71 retained the lean and hungry look he had had as a young man, but he radiated a sense of gloom. He taught a seminar on public policy at Stanford in Washington, and he had been devoting 20 minutes of each session to the inevitability of the coming war. Pincus often talked to his class about the decline in news standards and how Rupert Murdoch and deregulation had changed everything, resulting in the 24-7 news cycle and the Fox propaganda machine. Many of his students worked on the Hill or in government. Future podcasters, they absorbed much of their information from the growing mass of bloggers and other Web sites. It was obvious to them that the news business was undergoing a seismic transformation: newspapers were being hammered; young readers were falling away. Pincus had just discovered Jon Stewart, the satirical-news phenomenon, but blogs and the folkways of digital natives were a dim and secondary arena for him. He knew that Washington had changed since the 1970s, and that his kind of reporting, no matter how crucial, was no longer central to the news game. In a way, he and Woodward had become as antiquated as scrimshaw artists; they were labor-intensive masters of detail, making endless phone calls, working sources, putting stories on hold until they had triple confirmations.

"You'll see," Woodward had been telling Pincus. "They are moving stuff around at night in Iraq. The W.M.D. will all be found."

Woodward had been making notes for *Plan of Attack*, rechecking the moment when Prince Bandar bin Sultan, the Saudi ambassador and a close friend of the Bush family's, pressured the president to go to war. Woodward later wrote that the president had "bristled" at the prince's obvious audacity, but he barely mentioned Prince Bandar's long association with the Bushes, which would have provided a telling context. "What I do is all on the page," Woodward told me. "I don't weaponize my words. I don't feel the need to write, 'Guilty, guilty, guilty.'" Woodward had seen presidents and special prosecutors come and go and had written 10 No. 1 best-sellers over seven administrations. He had been criticized for being too close to his sources, and he had taught himself to keep surface emotion out of his writing. Outrage was for the younger reporters who needed to shake their maracas—as he once had—to make the front page.

Pincus was in the awkward position of having to convince young editors who had been in grade school when he worked for the Senate Foreign Relations Committee during the Vietnam era that, despite the stories coming from the administration, the C.I.A., *The New York Times*, and his own paper, the W.M.D. claims were highly questionable. Though a friend of 30 years' standing of Hans Blix, the chief U.N. weapons inspector, and close to George Tenet, the director of the C.I.A., Pincus nevertheless couched his information in the subdued language of a more cautious era. In the age of screamers and scolds on cable and talk radio and in the mushrooming blogosphere, doubt was not page-one material.

Woodward read Pincus's draft and wrote a new lead, then tracked down the national-security editor, and the story ran the next day. Woodward got a credit at the end of the article. The headline was sober—"U.S. Lacks Specifics on Banned Arms"—and the content, obscured somewhat under a muddle of qualifiers, was ominous: "Senior intelligence analysts say they feel caught between the demands from the White House, Pentagon and other government policymakers for intelligence that would make the administration's case and what they say is 'a lack of hard facts.'" The article made the Sunday edition, but on page A17, sinking into oblivion as America went to war. That day in the newsroom would later be written about and parsed by both men, who would disagree about the exact date of their conversation. Woodward would say, "In retrospect, I should have fought harder for the front page."

Neither Pincus nor Woodward could have predicted that day that the president's 16 words would ignite not only a war against Iraq but also a war between the C.I.A. and the White House, and another war still, in the press. For the sources who were feeding the American and British intelligence services wrong information about the W.M.D. had also influenced many reporters in the mainstream media, or MSM, as the bloggers called it.

When a former ambassador came forward to question one small piece of the White House's intelligence, a leak would be created, perhaps by the administration, to discredit him. First published by a well-known right-wing columnist, the leak would reveal the ambassador's wife as an undercover C.I.A. agent. That revelation may have been a violation of a rarely prosecuted national-security law, so a special prosecutor was appointed to investigate. He would unleash the fiercest debate over the meaning of a free press since the height of the Vietnam War. One journalist, long a lightning rod at her newspaper, would spend 85 days in jail before revealing her source. One of the president's men would be indicted—not for violating the Intelligence Identities Protection Act, but for perjury, obstruction of justice, and lying to the F.B.I. Woodward himself would ultimately be revealed to have been one of the reporters who had been aware of the information all along. And the rage over Bush's war would create a further possible danger: the weakening of reporters' ability to protect confidential sources.

The subsequent debate brought under national scrutiny a form of tipster journalism that had long been a basic ingredient of mainstream Washington reporting, but now it was magnified as countless blogs played to their cyber-constituencies. In 2003 there were 100,000 bloggers. Today there are about 27 million, a vast amoeba amplifying all sides of every issue. The partisan rants of Fox News and right-wing bloggers often echoed and endorsed the politics of the White House, but they also helped to enrage an opposition determined to undo the man it considered the most dangerous president since Nixon.

Gone were the days when Senator Daniel Patrick Moynihan proclaimed "there will be blood on the walls" before he would support

enforcement of press subpoenas. That was in 1992, when NPR's Nina Totenberg and *Newsday's* Timothy Phelps were investigated by a special counsel after they reported during the Clarence Thomas Supreme Court confirmation hearings a leak about Anita Hill's allegation of sexual harassment.

Now, as America went to war, the issues would get skewed and distorted. The truth of the matter would be subject to partisan negotiation, as Martin Kaplan, the associate dean of the University of Southern California Annenberg School for Communication, later remarked, "driven as much by specific people and historical circumstances as by abstract, timeless principles like press integrity and the public's right to know." For reasons that often seemed as personal as they did political, many reporters opposed to the Iraq war remained silent regarding the First Amendment rights of reporters they felt supported the administration's point of view. The paradox was that it would appear that so much of the rage against the journalists under siege would come from an unexpected flank—their traditional allies in the progressive left. Kaplan continued, "First Amendment laws apply both to people we love and people we loathe.... How would we partisans of one side react if the principle we were fighting about was 'our people,' rather than who they actually turn out to be? That is politics, not justice."

*I'm told by a person involved in the Niger caper that more than a year ago the vice president's office asked for an investigation of the uranium deal, so a former U.S. ambassador to Africa was dispatched to Niger. In February 2002, according to someone present at the meetings, that envoy reported to the C.I.A. and State Department that the information was unequivocally wrong and that the documents had been forged. ... Now something is again rotten in the state of Spookdom.* —Nicholas Kristof, *The New York Times*, May 6, 2003.

Pincus was having breakfast when he read Kristof's piece on the op-ed page. Kristof was a comer, and he had picked up something big. Annoyed at having missed it, Pincus hurried to the *Post* and began making calls. By then a statue of Saddam had been toppled in Baghdad and jubilant Iraqis had taken to the streets. The president's approval rating was at 71 percent, and Kristof had already started getting bitter mail. "You &#*! Who cares if we never find weapons of mass destruction, because we've liberated the Iraqi people from a murderous tyrant," he summarized the content. But that morning Kristof had raised the question that plagued Pincus: Where were the "500 tons of mustard gas and nerve gas, 25,000 liters of anthrax, 38,000 liters of botulinum toxin, 29,984 prohibited munitions capable of delivering chemical agents, several dozen Scud missiles ... 18 mobile biological warfare factories"?

Pincus started by calling a source at the C.I.A. "Did you read Kristof this morning?" It was a given that all the calls were on background, that the information Pincus would get was on the basis of trust. "Nobody knew who the ambassador was," Pincus later said. "Whoever had brought in this guy was not at the top of the agency."

It took two weeks for Pincus to get the name Joseph Wilson. Wilson had been the acting envoy in Iraq before the 1991 war, and in 1992 he had been appointed by George H. W. Bush as ambassador to the African countries of Gabon and São Tomé and Príncipe. Out of foreign service after 23 years, he had accepted a position as an unpaid adjunct scholar at the Middle East Institute, and he was happy to appear in any forum to take on the neocons in their push for war. Pincus was unaware that Wilson had recently been on Fox News debating the issues and had published an article in *The Nation* arguing against going to war in Iraq. When he finally spoke with Wilson, he wanted to know if the vice president had sent him on the mission, as Kristof suggested.

Wilson said he had been startled to hear the president suggest that Saddam had been uranium shopping in Africa. The next day he phoned the State Department, asking if the president had been talking about Niger. Had the president misspoken? Wilson was told that perhaps the African country referred to was not Niger. Wilson's anger grew, however, when he heard Colin Powell address the U.N. on February 5. "There was no mention of Africa and Saddam's purchase of uranium," he told me, adding that Powell later explained he had not included the information because "it did not rise to his standards. So how the hell did it rise to the standards of the president of the United States?"

Wilson was soon a controversial public figure: a hero to many anti-war Democrats, a preening careerist to his critics. He understood one basic Washington rule: The person who has the biggest megaphone wins. He published a book grandly titled *The Politics of Truth* and used the honorific "Ambassador" in the byline. Soon after Powell's speech, Wilson made a series of TV appearances—CNN, *Now with Bill Moyers, Nightline.* He did not, however, disclose his C.I.A. mission to Niger. Kristof and Pincus would be the first journalists to reveal it.

Pincus listened to Wilson tell his story, but he did not ask him about his personal life. He concentrated on whether Cheney's office had sent him on the trip. The interview was all on background, at Wilson's request. After returning from Niger in March 2002, Wilson had reported to the C.I.A. that there was no evidence to support allegations of uranium sales to Iraq. Now, increasingly frustrated that no one would correct the record, Wilson took a half-step into the spotlight, allowing Kristof and Pincus to write about his trip without mentioning his name. Pincus's article ran in *The Washington Post* on June 12, on page one. Since *The New York Times* had not followed up Kristof's column with a news story, Pincus's article was a scoop. It was, however, written in the careful style required with an unnamed source and such explosive material. For anyone outside the loop, it was difficult to understand what the bombshell was: that the C.I.A. had buried important intelligence, and that the administration was discarding critical information. Pincus's phone rang almost immediately. "You have this wrong," a C.I.A. source told him. "This is the completely wrong emphasis. No one at this agency buried any information."

*Those news stories about that unnamed former envoy who went to Niger? That's me.* —Joseph Wilson, *The New York Times*, July 6, 2003.

Disappointed when Pincus's article made little impact, Wilson considered what to do next. Since he detested the pro-war editorial policy of *The Washington Post,* he decided to approach *The New York Times* about going public on the op-ed page. The *Times* titled Wilson's article "What I Didn't Find in Africa." Pincus and another reporter, Richard Leiby, persuaded Wilson to let the *Post* publish a profile of him the same day. During the preparation of the article, Leiby mentioned to Pincus that Joe Wilson had baby twins. It was the first time Pincus knew that Wilson was even married.

The articles brought down a fusillade of attacks on Wilson. The first sign of real trouble was on July 8, when a friend showed up at his office after having run into the columnist Robert Novak on Pennsylvania Avenue, who had said, "Wilson's an asshole. The C.I.A. sent him. His wife, Valerie, works for the C.I.A."

People who know Novak have no trouble imagining him in that scene. At 75 he is still volatile, with a free-flowing anger that keeps him churning out his syndicated column. He has stormed off a set at CNN yelling "Bullshit" and gotten into scuffles at airports. For years he collaborated on a column with the late Rowland Evans Jr., and he tirelessly propels himself through the Washington party circuit. Many people consider him an apologist for the Bush White House.

Wilson took immediate action, complaining to Eason Jordan, chief news executive at CNN, and later berating Novak himself on the phone. Novak apologized and responded, "Can I use this as a confirmation?" He followed up with a now infamous column on July 14, in which he said, "Wilson never worked for the C.I.A., but his wife, Valerie Plame, is an Agency operative on weapons of mass destruction. Two senior administration officials told me his wife suggested sending Wilson to Niger to investigate the Italian report."

On July 21, Wilson got a call from Chris Matthews, the host of *Hardball,* saying, "I just got off the phone with [Bush's chief political adviser] Karl Rove. He says, and I quote, 'Wilson's wife is fair game.'" "It never occurred to me that they would go after my wife," Wilson later told me. Valerie Plame had been undercover at the agency for nearly 20 years.

The publication of Novak's column, Wilson later wrote, "marked a turning point in our lives." Asked by the C.I.A. not to publish Valerie Plame's name, Novak charged ahead, saying he believed that the request had been "a soft no, not a hard no." This, for Wilson, indicated "new heights of journalistic irresponsibility," but it also provided an opening for journalists to suggest that Novak had been deliberately used by the administration. That charge was led, not insignificantly, by David Corn of *The Nation,* who knew Wilson. On July 16, Corn asked on his blog, "Did senior Bush officials blow the cover of a U.S. intelligence officer working covertly in a field of vital importance to national security—and break the law—in order to strike at a Bush administration critic and intimidate others?"

Corn's blog helped to mute the White House's insinuation that Wilson's mission to Niger had been driven by nepotism. One week later, Wilson was in New York, in the boardroom of *The Nation* with the editor, Katrina vanden Heuvel. Wilson later reported that somebody said, "We should give him a standing ovation." That afternoon he went to *The New York Times* to meet David Shipley, the editor of the op-ed page. That night he went on *The Daily Show* with Jon Stewart and made jokes about receiving a letter from Dick Cheney asking him to co-chair the Washington, D.C., campaign to re-elect Bush and Cheney. The following month in Los Angeles, he was introduced by the writer Arianna Huffington at an event given by an activist organization founded by TV producer Norman Lear.

Wilson was now in place to become the new anti-administration celebrity hero. Months later he told me, "It would have been a two-day story at most. My part was over. I had come forward. The White House said that the intelligence did not rise to the level of inclusion in the State of the Union address. That was the end of it. They had corrected the mistake of the 16 words. I was ready to go away. I had done my civic duty. Then they came after my wife." He added, "Guys like Scooter Libby [Dick Cheney's chief of staff] would go around and say, 'There is more to come on this.' If anyone thought this was going to come out on its own, they were wrong. If anyone thought I was going to let them impugn my character and drag my wife into the public square, they were *dead* wrong."

If the charges now filed against him are true, I. Lewis "Scooter" Libby, a cunning lawyer who had represented fugitive financier Marc Rich, made a severe miscalculation in failing to see that by leaking Plame's identity to discredit Wilson he was activating a trip wire that would lead to a special prosecutor, and he could not have guessed that the end result of his action would be his own indictment. No other special prosecutor had ever gone so far as to demand that reporters either divulge their sources and testify in front of a grand jury or go to jail.

Joseph Wilson's war had a purpose—to have the Justice Department investigate the White House. Within the press corps there were soon demands for something highly unusual—that Robert Novak give up his sources—and there were triple flips of logic to make that seem reasonable. On the op-ed page of the *Times,* on February 6, 2004, a former *Washington Post* ombudsman expressed what would become the view of a significant portion of the mainstream media: "Journalists' proud absolutism on this issue [of protecting anonymous sources], particularly in a case involving the syndicated columnist Robert Novak, is neither as wise nor as ethical as it has seemed." Was Novak protecting a criminal White House? Traditionally, there have been two generally recognized exceptions to journalistic privilege: matters of life and death and imminent actual threat to national security. *The Wall Street Journal* archly commented on "the Novak exception" on February 20, soon after Special Prosecutor Patrick Fitzgerald was appointed to investigate. The anti-Novak argument at first sounded plausible, but it would become a quagmire for the profession. By failing to defend the rights of a columnist they might despise, did Novak's critics leave themselves vulnerable to a possible avalanche of future subpoenas? Did partisan politics trump the First Amendment?

## II. THE RENEGADE

*There are not going to be 50,000 reporters or 54,000 reporters arguing for confidentiality, and that is because our Attorneys General of the United States and their delegates have had the good wisdom and the good judgment not to push these kinds of issues very often.* —Robert Bennett, attorney for *New York Times* reporter Judith Miller, July 6, 2005.

In May 2003, while Judith Miller was still in Iraq, the e-mails started coming. Their sheer volume made it impossible for her to access her system. She was oblivious to the fact that she had become a major target for the intense public anger directed at Bush's war, owing to her reports that Saddam Hussein was producing weapons of mass destruction. Miller had to wait until she got back to New York that month to turn on her personal computer, and when she did the screen blinked and went blank. "What is going on here?," Miller asked a technician she called in. "You have 8,000 of these messages," he said.

It was a period of chaos at *The New York Times*. Howell Raines, the executive editor, was in deep trouble over the Jayson Blair affair. The young, pampered reporter, who had a drug problem, had fabricated or plagiarized dozens of stories and had been forced to resign in disgrace on May 1. Miller's confidant, managing editor Gerald Boyd, had been dealing with the fallout. In addition, Raines was under fire for his imperious management style.

Miller later recalled Boyd and Raines telling her then, "There has been a lot of flak over your stories." It was becoming clear that the W.M.D. issue had been largely a propaganda vehicle used by the administration to sell the war to the press, and Miller's articles were suddenly seen as having been key in turning public opinion in favor of the war. All the stories she had written in the past on the financing of al-Qaeda, the threat of bioterrorism, Taliban training camps, and national security seemed to evaporate in a blaze of criticism. At first Raines and Boyd defended her and her stories about the Middle East, but they warned her, "Roger does not think you should go back."

"I told Judy that she could not go back," Roger Cohen, the foreign editor of the *Times*, told me recently. "There were concerns about her sources and her sourcing.... We talked about it in my office for an hour." Miller was able to prevail, however, and she returned briefly to Iraq, she later said, "to try to report on why the W.M.D. had not been found." She concentrated on one crucial aspect: why there were doubts about the mobile labs. "I wanted to find out how the intelligence services had gotten this so wrong," she said. "There was a tremendous divide over it."

It was more like a firestorm, and Miller was at the center of it. "Suddenly, thousands of people who had tapped into the blogs were e-mailing me that I had started the war, that I was the shill for the administration. None of my colleagues ever spoke to me about my reporting. But they would say, 'We don't want to work with her.'"

On June 5, Raines and Boyd both resigned under pressure. Five weeks later Bill Keller, Raines's chief rival at the paper, became the new executive editor.

I met Judy Miller in 1993, when she married Jason Epstein, who was then my editor at Random House. Intensely loyal, she had an ability to keep moving relentlessly forward and rarely questioned herself. Her father owned the Riviera nightclub in Fort Lee, New Jersey, and was part owner of several hotels in Las Vegas. At Princeton's Woodrow Wilson school she focused on the Middle East, and by 1983 she was in Cairo as the first woman bureau chief for *The New York Times*. She was, recalled former consul general Frances Cook, a "serious girl who wore long paisley skirts and had a ballpoint that hung from her neck, observing a society that was turning fundamentalist." Over the years she wrote a series of books, including *One, by One, by One*, about the aftermath of the Holocaust, and *God Has Ninety-nine Names*, about extremism in the Middle East. She co-authored *Saddam Hussein and the Crisis in the Gulf* with Laurie Mylroie and *Germs* with William Broad and Stephen Engelberg. To her critics she was an overknowing Cassandra, but to her admirers her reporting was often prescient.

Back from Iraq in June 2003, Miller realized that she was losing her authority. She had worked with Bill Keller for years, and she admired his reporting. He was a fellow Pulitzer winner. But now Keller was in a sensitive situation. Miller would have to be reeled in. "You are radioactive," she says he told her. "You can see it on the blogs." "Why do you give a shit about the blogs?," Miller remembered asking Keller. "They do not know anything." (Keller responds: "I'm pretty sure I never said any such thing.")

Miller later told me, "The bloggers were without editing, without a way for people to understand what was good, what was well reported—to distinguish between the straight and the slanderous. Things would get instantly picked up, magnified, and volumized.... I was appalled, not by the blogs—that would be like getting appalled at the Industrial Revolution—but by my colleagues, who believed what they read on the blogs."

But it wasn't just the blogs. By then a platoon of reporters, including Seymour Hersh in *The New Yorker*, had pounced on the issue of the missing W.M.D. Soon the criticism rose to a critical mass. Miller and the *Times's* Baghdad-bureau chief, John Burns, another Pulitzer winner, had had an acidic exchange over Chalabi, one of her longtime sources, which was picked up by *The Washington Post's* Howard Kurtz. "If reporters who live by their sources were obliged to die by their sources, *New York Times* reporter Judith Miller would be stinking up her family tomb right now," *Slate's* Jack Shafer would later comment.

Late in June, Miller scheduled time with Scooter Libby, who had been of help to William Broad during the writing of *Germs*. Libby was an

inside man, with watchful eyes and a tight, folded face. His speech pattern was quick—question, answer, question, answer. Part of his job with Cheney was to calibrate the possible political damage any given action could do. He was, however, a contradictory figure, who, as a Washington lawyer, had in 1996 surprised many who knew him by writing a finely crafted novel set in Japan in 1903, which became notorious for its dirty passages.

Miller did not question Libby's desire to sell the war. For her, he was "a major figure" and "one of the most senior people I interviewed. I never interviewed the vice president, never met the president, and have met Karl Rove only once. I operated at the wonk level. That is why all of this stuff that came later about my White House spin is such bullshit. I did not talk to these people.... Libby was not a social friend, like [neocon] Richard Perle."

On June 23 she arrived at the Old Executive Office Building to see Libby. She went to the interview with a key question written in her notebook: "Was the intell slanted?" "Intell" meant the intelligence assessments of Iraq, and she underlined the word "slanted." Libby, she later wrote, was "displeased" with what he called "selective leaking" by the C.I.A. He called it "a hedging strategy," and Miller quoted him in her notes: "If we find it, fine, if not, we hedged." He was laying out for her the clear signs of a war between the White House and the C.I.A., but Miller wrote in her notebook "highly distorted," a reference to Libby's defense of his boss, who was being accused of embracing "skimpy intelligence reports" while ignoring evidence to the contrary. In the interview, Libby referred to a "clandestine guy." Miller wrote, "Veep didn't know of Joe Wilson." She put in parentheses "wife works in bureau?" She believed, she later testified, that the reference was to the C.I.A. One of the enduring mysteries of the case would become who told Miller what, and when. Although it would take her two years to remember this particular meeting—a fact impossible for many to believe—she wrote at the top of one page of her notes, "Valerie Flame." She has said that she does not know who the source was.

She recalled Libby's anger at the C.I.A. for failing to share "doubts about Iraq intelligence." He told her, "No briefer came in [after the State of the Union address] and said, 'You got it wrong, Mr. President.'" Over the next few weeks, she saw Libby two more times. The June meeting, she would later insist, slipped from her mind. "I did not remember the meeting until I saw the notes," she told me. "Can you imagine that?"

She didn't publish a word about Wilson or his wife.

**December 2004, New York City**
"Something bad is happening," Miller told Jason Epstein. "I think I might be going to jail." Epstein, a founder of *The New York Review of Books*, had a wry sense of the world and the long view of power politics. "Going to jail—that can't be right," he said.

"That is where this is going to lead," she said.

"Well, if that's the case," he said, trying for lightness, "get a lawyer from the Yellow Pages so it won't cost so much."

"I already have a lawyer," she said. "Floyd will do it." Floyd Abrams, the specialist on First Amendment law, had with James Goodale represented the *Times* during the days of the Pentagon Papers—the explosive publication in 1971 of thousands of pages of classified information which laid out the government's deception during the Vietnam War. He had also helped to forge important case law to protect the right of journalists to have confidential sources. Although 49 of the 50 states and the District of Columbia now afforded some kind of protection, there was still no federal shield law. By the summer of 2004, Abrams had grown alarmed over the sharp increase in cases brought against reporters. He understood the gravity of what was at stake and the intensity that Patrick Fitzgerald was bringing to the issue. A 2003 opinion by Judge Richard A. Posner, a conservative Chicago jurist, emboldened prosecutors and judges to go after journalists. "A large number of cases conclude, rather surprisingly … that there is a reporter's privilege," Posner wrote. "These courts may be skating on thin ice."

Suddenly, Abrams had a flurry of daunting cases. In 2002, Fitzgerald had come after *Times* writer Philip Shenon for reporting the story of F.B.I. raids on the Global Relief Foundation and the Benevolence International Foundation, Muslim charities in Illinois with suspected ties to terrorist organizations. He demanded Shenon's telephone records for 18 days and an interview with him. The *Times* refused to comply, but Fitzgerald reiterated the request in July 2004, this time asking additionally for an interview with Judith Miller and 23 days of her phone records, in relation to another Muslim charity.

The Muslim-charities case was entirely separate from the Valerie Plame affair. Abrams and Fitzgerald had spoken on several occasions about the former. "It was clear that he thought the *Times* had misbehaved, and that it was not just a question of who leaked information," Abrams said. "What the *Times* viewed as routine questions of entities involved in ongoing news stories, Fitzgerald viewed as tipping off entities in a criminal investigation." Such subpoenaing of phone records raised startling and disturbing new press-rights issues for Abrams. (Fitzgerald would subsequently lose the first round of the Muslim-charities case in federal court.) "When we would call each other, I would have to make clear which case it was," Abrams told me. "I would say, 'I am calling about the case we are winning.' … At the same time he was trying to put Judy in jail, he was calling to ask for more time, in which he was asking for Judy's phone records."

That summer Abrams was also defending *Times* reporters James Risen and Jeff Gerth in a privacy suit brought by nuclear scientist Wen Ho Lee, who had been charged with 59 counts of mishandling classified information stemming from his employment at Los Alamos, and who spent nine months in solitary confinement before pleading guilty to downloading classified information to portable cartridges. The *Times* had

weighed in with a measured apology for its inaccurate reporting, which deflected a likely lawsuit but offended some reporters in the newsroom. Abrams was concerned that Fitzgerald's efforts could leave journalists unprotected when they used confidential sources, as they had been doing in the late 1960s, when the Nixon administration initiated a blitz against the press.

Abrams was also representing Matthew Cooper of *Time* magazine, who had been subpoenaed after he revealed Valerie Plame's identity on *Time*'s Web site, and he would soon represent Judith Miller as well. Miller had already spoken to George Freeman, the *Times*'s in-house counsel. "I said, 'George, I think we are going to have a problem,'" Miller recalled. "I knew Valerie Plame's name. I knew who she was. I talked to many people in the government about her. He said, 'Before Novak's article?' And I said, 'Before and after.' ... He said, 'Don't worry about it.' I said, 'Why not?' He said, 'Because I'm sure they'll go after Novak first. He's the one who outed her.'"

But Abrams sensed how ominous the situation might be. Cooper's sources, the lawyer knew, had been Scooter Libby and Karl Rove. Based in Washington, D.C., Cooper had little protection. "There was no federal shield law, and the only protection the law could give Matt was under the First Amendment and federal common law," said Abrams. "While it was a coincidence that the Wen Ho Lee privacy suit, the Muslim-charities case, and the Plame case all arose at the same time, the fact that they did really tells the story of the increased efforts by prosecutors and private lawyers alike to break the bonds between journalists and their sources, which had not been seen since the 1970s."

In June 2004, Abrams attempted to discuss the situation with Fitzgerald. "I called him up and asked to come to Chicago to sit and talk with him," Abrams told me. The two men did not know each other well, but Abrams's daughter, Ronnie, a prosecutor in the Southern District of New York, had known Fitzgerald when he ran a counterterrorism squad.

"Don't go down this road, Pat," Abrams said he had told Fitzgerald in Chicago. "I am here to urge you to avoid subpoenaing journalists and the ensuing battles that will come from it." Abrams later recalled, "He responded that he had thought long and hard about the issue and had pruned down the list of journalists who were of substantial relevance. He said, in effect, that he would not have started down the road unless he was prepared to go to the end." Abrams said Fitzgerald had told him that he was absolutely sure that his case was solid and that "he would not consider ceasing the pursuit of journalists who he thought had highly relevant information." Walking out of Fitzgerald's office, Abrams later said, "I thought it was absolutely hopeless."

In Washington, Walter Pincus was informed by *Post* lawyer Eric Lieberman that he too had been subpoenaed on the Plame matter. So had NBC's Tim Russert.

In private, Russert was deeply concerned about the consequences of any possible public testimony, but the network announced, "NBC News is resisting the subpoena because of the potential chilling effect on its ability to report the news."

Pincus had skirted the F.B.I.'s attempt to interview him about the Plame matter, and he believed that the process by which he had learned of it was not a criminal act. "I thought it was damage control. My source had been trying to get me to stop writing about Joe Wilson. I believed that the Democrats were too wound up thinking that a crime had been committed."

The 1972 Supreme Court case of *Branzburg* v. *Hayes* had always vexed Abrams. He had gone into practice several years after graduating from Yale Law School, in 1963. There was then little case law that clearly defined the First Amendment rights of the press when national-security issues were involved. In the 1920s and 1930s, Justice Holmes and Justice Brandeis had fiercely defended the principle of free speech, and there had been a famous case, *New York Times Co.* v. *Sullivan*, which spelled out some parameters of libel law. But between 1969 and 1971, Abrams wrote in his book *Speaking Freely*, NBC and CBS alone had received 122 subpoenas for reporters to appear before grand juries. The Branzburg case tested under what circumstances the government has the right to compel reporters to give up confidential material. It comprised four separate cases. The first dated back to 1970, when *Times* reporter Earl Caldwell, who had spent time with the Black Panthers in Oakland and Berkeley and reported on the organization, received a subpoena. This was at the height of the Vietnam War, and the Panthers, who had threatened Nixon's life, had become a target of his Justice Department. Caldwell's case reached the Supreme Court at the same time as three other cases, two involving Paul Branzburg, of the Louisville *Courier-Journal*, and one involving Paul Pappas, a TV newsman. The Supreme Court came to one decision for all four, commonly referred to as *Branzburg* v. *Hayes*. Justice Byron White's opinion for the five-to-four majority was brutal. "The issue in these cases is whether requiring newsmen to appear and testify before state or federal grand juries abridges the freedom of the press guaranteed by the First Amendment. We hold that it does not."

That opinion, recalled James Goodale, was thought to be "a catastrophe for the press." Taken to its extremes, it would mean that reporters could rarely guarantee any protection to sources. Justice Lewis Powell was the deciding vote, but the language of his opinion seemed to suggest an uneasiness with White's stern mandate, allowing for the possibility of a case-by-case basis and paying heed to the necessity of maintaining the crucial role of the American press. Goodale focused on Powell's wording. "I sent my family away and locked myself into the apartment for a week without air-conditioning. I was looking at the case and asking myself what were we going to do to try to protect reporters. I stared at the fucking thing, and it looked like curtains. All of a sudden inspiration hit me. I realized that the court had the votes that might just form privilege." If a reporter believes a grand-jury investigation is "not being conducted in good faith," Powell wrote, he may get some leeway not to testify.

Goodale came up with a strategy to re-interpret the five-four opinion. "No one had taken the time to think it through," he said. "I wanted to organize the press lawyers of the United States, and I was able to get 70 lawyers in a room. We decided to fan out the fight." They began to use the Powell opinion in their arguments in court, applying it on behalf of their clients. "We used to bicycle the briefs around! They were so thick, and there was no fax. It became known that this was the way to protect reporters. There was no law in any federal court, and there were very few shield laws. From that humble beginning, 30 years ago, we were able to get 49 states to have some protection for reporters.... The courts, however, became more conservative.... [The Judge Posner decision] cut the feet out from under Plamegate."

*I mean, Your Honor, if I were doing a blueprint for a corrupt country, the first thing I would do is to say reporters cannot have confidential sources, and those who do, must reveal them.* —Robert Bennett, U.S. District Court for the District of Columbia, July 6, 2005.

The weekend of the Fourth of July passed in a haze for Judy Miller. "I was told to put my medications in a Baggie, to understand that I would have no makeup, no personal items except for my pills," she told me. "You are going in one door of the courthouse and out another," her lawyers Bob Bennett and Saul Pilchen had told her. For nine months, all the way up to the Supreme Court, Miller and Matthew Cooper had argued their decision to refuse to testify. Judge David Tatel, of the U.S. Court of Appeals for the District of Columbia Circuit, had written eloquently of striking a balance between press freedom and law enforcement, but in the end had ruled against the two reporters. Eight pages of redacted information in his decision suggested to many at the time that Fitzgerald may have uncovered a violation of the agent-identity act and a criminal White House conspiracy. By July, blogs were predicting Karl Rove's imminent indictment, and the partisan rhetoric was in overdrive.

Meanwhile, a vigorous debate had begun within the reporting community: Was Miller and Cooper's stance simply a matter of protecting sources, or was it the result of the machinery of Washington reporting, with relationships forged over years and information obtained through friendly chats, general gossip, planted smears, and useful tips? And if it was the latter, was there anything wrong with that? Had Rove and Libby figured out a way to game the system by cornering reporters with confidentiality pledges? For absolutists, Fitzgerald was a threat to the reporting process. For Bush-haters, he was a hero doing the work for reporters who had no access to the inner workings of the White House. There were heated conversations about the ethics of getting information from whistle-blowers, scammers, and enemies with an agenda.

There was also the issue of corporate pressure. For example, NBC and *Time*, which respectively employed Tim Russert and Matt Cooper, were parts of huge companies whose shareholders seemed to be as concerned with profits and federal regulatory issues as with legal battles to overturn *Branzburg* v. *Hayes*. The arguments thrummed in drawing rooms and on cable-TV shows, as well as on the Web. A mass of fixed positions issued from the noisy new democracy of the blogs—Chalabi-haters, Rove fanatics, bloviators floating theories about who had been Novak's source. "Pardon me while I intrude on the whorish theater of martyrdom now assigned to the likes of Judith Miller. The same Judith Miller who is going to jail to protect whom? Sources such as Chalabi? ... Yet many talking TV-journo-some-things are arguing that it is the principle of a 'free press' that is at stake here, not who the source is," declared a contributor to the Huffington Post, a Web site launched in 2005 by author Arianna Stassinopoulos Huffington. Such vitriolic points of view were becoming as influential as the weighty opinions held by the scrimshaw artists.

"Does a rogue White House or for that matter a rogue reporter deserve protection?," James Goodale asked. "Under the strict rules for confidential sources, clearly yes." He was a whisper in the roar, however, as many defenders of the press vanished in the jumble of issues. The "criminalization of politics does no one any good," *Washington Post* writer Richard Cohen noted in a column that provoked a flood of e-mails from the left.

The speed of delivery and magnification of the blog information raised another question: Had the mainstream media lost its monopoly? "Before the Web, the realm of journalism criticism was dominated by the cranky right," Martin Kaplan observed. "With a handful of exceptions with limited impact on the consensus, the center and the left were reluctant to undermine the credibility of the high-end media because the elite press was their best hope to offset conservative propaganda masquerading as journalism." Moreover, many of the traditional media companies had been taken over by vast corporations that cared little for the sacrosanct rules of Fred Friendly's CBS News and Henry Luce's Time Inc. The high-end media themselves seemed to be in peril.

"Why do you keep insisting this is important?," Bob Woodward asked Carl Bernstein in early July. "I know something about this. There's nothing there."

Woodward was referring to the Fitzgerald investigation, but he did not read the blogs. "If something is important, one of my researchers will show it to me," he told me. Mired in writing his next book, however, he could not see what was coming at him. Woodward and Bernstein were on the telephone often, scheduling interviews to discuss *The Secret Man* and the identity of Deep Throat, former No. 2 F.B.I. official W. Mark Felt, after he went public. It was an apt moment to argue for the necessity of confidential sources, since theirs had helped bring about the resignation of a president.

"You don't have this right," Bernstein told his old partner. "This thing is going to be huge. It will shine a light on the way Bush's White House operates. It is going to expose the president and his campaign of disinformation." Bernstein had become convinced that the current mess was a White House attempt to make the press the enemy.

Woodward had learned about Valerie Plame while *Plan of Attack* was still in the research stages, but he considered the matter so unimportant that he made only a single mention of Joseph Wilson in the book and said nothing at all about her, suggesting, as many critics have noted, that he could be lost behind blinders. Woodward later said that the only person he had let in on his secret was not Len Downie, *The Washington Post's* editor, but Walter Pincus. Woodward insists that two years earlier he had stopped by Pincus's desk and told him that he knew about Plame. Pincus told me, "Bob said he said it. I never heard it."

Woodward was in a tricky position. People close to him believe that he had learned about Plame from his friend Richard Armitage, Colin Powell's former deputy, who has been known to be critical of the administration and who has a blunt way of speaking. "That Armitage is the likely source is a fair assumption," former *Washington Post* editor Ben Bradlee told me. "I have heard about an e-mail that was sent that had a lot of unprintable language in it."

"What I knew was casual and offhand," Woodward told me, however. "Something was mentioned in conversation to me—it was gossip. All of a sudden there was a lot of chatter. I thought a subpoena might come my way any day. I thought I might be mentioned in the indictment.... I should have told Len Downie."

I asked him, "Was this a case of being in a relationship where you traded information with a friend?" Woodward corrected me sharply: "It's not trading information. It is a subterranean narrative. What do you have? What do you know? If you start making this a criminal act, people will not speak to you."

"When a special prosecutor is out looking for leaks, everyone clams up," Richard Cohen later remarked. "You have to watch your own ass. Suddenly you are dealing with lawyers. Can you print this? Can you do that? It is not a five-minute meeting. It can be three days. Your sources start to get nervous. It is intimidating and chilling. That is why I hate this investigation."

Pincus, who was by then battling his own subpoena, had studied Posner's decision. "I believed firmly that the sources controlled the privilege," he said. One of his sources had conveyed to Pincus through lawyers that, since he had revealed his own identity, Pincus could testify but not name him publicly. As Pincus said, "If their identity was known to Patrick Fitzgerald, what confidence was I breaking?" He was therefore able to make what reporter Lowell Bergman would later call "a cute deal"—maintaining publicly the confidentiality of one of the men he had spoken with. A separate arrangement was negotiated by NBC's lawyers for Tim Russert's limited testimony.

"Can't you make an argument that this was the pragmatic tactic to take?," *Newsweek* senior editor Jonathan Alter asked Bergman. "It is until you are the next reporter subpoenaed and you have no protection," Bergman replied. Like many other reporters, Alter later said, he was trying to understand the issue. "I was torn about it, but ultimately I agreed with Bill Keller that you have to fight with the army you have."

That July 4 weekend in Sag Harbor, New York, Miller got the idea of writing a statement to read in court. She felt this was her opportunity to get her views on the record, and she assumed that the *Times* and every other major newspaper would print a substantial section. She focused on the notion of civil disobedience, which was at the heart of the Declaration of Independence. Bob Bennett encouraged her: "I wanted her to show humility and speak from the heart. Attacking the prosecutors was not the way to go."

Miller's intent was to convey the need for a federal shield law to protect journalists, but the days when one could issue such a statement of purpose were as bygone as hula hoops. Anything that sounded remotely like grandstanding could be shredded in the blogosphere.

On the evening of the Fourth, six of Miller's friends gathered for a quiet dinner at a trattoria on the Upper East Side of Manhattan. "I am not in orange yet," Miller said with a tight smile as she arrived. Most of the women at the table were in the media. I helped organize the evening. Like many of Miller's friends, I agreed that reporters should not be used by prosecutors for information-gathering purposes. One person said to Miller, "You did not *write* anything! Why are you going to *jail?*"

By then the number of American fatalities in Iraq had risen to more than 1,700, and it had become a challenge to keep the issues of national security and journalistic freedom separate. It was difficult to reconcile Miller's credulous W.M.D. reporting with her courageous stand on the reporter's privilege. What did it mean to grant confidentiality if you were a party to mistaken information or a smear? Should a government official engaged in a cover-up have the right to demand that a conversation be off the record? "What is going to wind up here is that reporters all over the country are going to be used as witnesses," Lowell Bergman predicted that weekend. "And the [fact] remains: Miller did not write anything, and no one knows what she knows."

On the train to Washington the next day, Jason Epstein turned to his wife. "You know, you can still get out of this thing. It is not too late. This is like Watergate. You are in a tight spot. By taking a stand on principles, you are going to be accused of protecting bad people." Though he had no idea who Miller's source was, he had little respect for people such as Richard Perle and Ahmad Chalabi, both promoters of the war. While Miller was in Iraq, Epstein had been writing an article that would be published in *The New York Review of Books*, comparing Bush's invasion of Iraq to Captain Ahab's obsession in *Moby Dick*.

"How can you say that to me?," Miller snapped at him. "You know what's at stake here." She was so angry that she moved to another seat.

For several months before Patrick Fitzgerald was named special prosecutor, the F.B.I. had been in charge of investigating the Plame leak. "I was interviewing people involved in the investigation at the time, and they felt that there was no violation of the Intelligence Identities Protection Act," Lowell Bergman said. Nevertheless, Fitzgerald had been given the mandate to press ahead.

According to his later indictment, Libby had provided the F.B.I. with details of a conversation he had allegedly had with Tim Russert: "Russert asked Libby if Libby was aware that Wilson's wife worked for the CIA. Libby responded to Russert that he did not know that, and Russert replied that all the reporters knew it." Russert's testimony contradicted Libby's, however, and Russert is named in three of the five subsequent counts against him. Cooper is also named in three counts. Miller is named in only one. According to Goodale, in *New York Law Journal*, "Mr. Libby says he learned of Valerie Plame from Mr. Cooper and Mr. Russert. They say that is not true. Without going into details, the discrepancy in the two stories seems greater in the case of Mr. Russert. And that is why he may become the star witness in the case."

Novak's article and Wilson's response to it had resulted in the appointment of a special prosecutor, millions in legal expenses, and subpoenas to Cooper, Miller, Russert, Pincus, and other reporters. By July 4, only Miller and Cooper were still resisting giving Fitzgerald further information. As Floyd Abrams told me, "If someone from the White House had said at the beginning of all of this that what Lewis Libby had said was 'I learned it from Cheney, who learned it from the C.I.A.,' people would have said, 'So what?' That is hardly the charge that made it necessary to shake the Republic."

While reporters waited in the corridor leading to Judge Thomas Hogan's courtroom, they were able to read a memorandum arguing that Miller should not be allowed to have home or residential-prison-camp confinement. Fitzgerald's memo cited several statements by important authors, including the *Times's* Pulitzer Prize–winning former columnist Anthony Lewis ("Do we really want the authors of defamatory articles to hide behind alleged anonymous sources?") and Bob Woodward, who in an interview with the *Columbia Journalism Review* underscored the need for confidentiality on major national issues, though not in the Plame matter. "This is not the Pentagon Papers," he said. "It's not the case you'd choose to make law on." Fitzgerald also quoted Norman Pearlstine, then editor in chief of Time Inc., on his decision to comply with the court's order: "The journalist and the lawyer were fighting in my head. But if presidents are not above the law, how is it that journalists are?"

"*Un panier de crabes*—a basket of crabs—is what the politico-journalistic village of Washington resembles in this unhinged summer," James Hoagland would write in *The Washington Post*.

The lack of interest from the general public in the story was obvious in the corridor. There were more than 100 reporters lined up to get seats in the courtroom, but there were just 32 people in the line for general seating. Miller's lack of popularity among her colleagues in the *Times's* Washington bureau was clear when the reporter David Johnston arrived. "Here to show support?" one reporter called out. "Let's not go that far," he said. The remark, tossed off as a joke, was a taste of the hostility that would be leveled at Miller in the coming months by *Times* colleagues, including Maureen Dowd.

In court, Matt Cooper, his face puffed with emotion, announced that he had gotten an "expressed personal consent" waiver from his source and was now prepared to testify in front of the grand jury. The decision had been an agonizing one, he said.

Miller, in a navy quilted jacket, read her statement in a clarion voice:

*I am not above the law, and do not view myself as above the law. I am here today because I believe in the rule of law and your right to send me to prison for disobeying your ruling if you choose to do so....*

*For decades, I have lived and worked in Middle Eastern and other countries where there is no independent judiciary. I have chronicled what happens on the dark side of the world when the law is an arbitrary foil that serves the powerful—in Iraq under Saddam Hussein for instance....*

*But I also know ... that the freest and fairest societies are not only those with independent judiciaries, but those with an independent press that works every day to keep government accountable by publishing what the government might not want the public to know.*

*Thomas Jefferson put it best: If he had to choose between government and newspapers, he would choose the latter, because the latter is the long-term guarantor of the former.*

*[A] promise of confidentiality once made must be respected, or the journalist will lose all credibility and the public will, in the end, suffer.*

Hogan seemed moved by her statement until she invoked her time in Iraq. I watched his face darken. Fitzgerald, in response to Miller's statement, said, "Ms. Miller has great respect for the military who served in Iraq, as we should all do, but if one of those officers' [lives] was compromised by the leak of classified information, we would want to see that justice was done." It was clear that Hogan had no intention of letting Miller off. As she was sentenced, her *Times* colleague David Barstow was choked with emotion. "I have never been as proud of another

human being in my life," he later said. Frances Cook, the former diplomat, wept. "I feel awful," Bob Bennett said in the car outside the courthouse. "You know it's coming, and there is nothing you can do." Miller's statement, though it was available on the *Times's* Web site, was not printed in any major newspaper.

### III. THE FALLOUT
*A very different scenario is floating in the halls [of the* Times]. ... *Miller doesn't want to reveal her "source" at the White House—because she was the source. Sure, she first got the info from someone else, and the odds are she wasn't the only one who clued in Libby and/or Rove (the State Dept. memo likely played a role too) ... but in this scenario, Miller certainly wasn't an innocent writer caught up in the whirl of history. She had a starring role in it.* —Arianna Huffington, the Huffington Post, July 27, 2005.

'Y ou are going to get upset with this," Saul Pilchen told Judy Miller during one of his visits to the Alexandria, Virginia, jail. A former federal prosecutor in Washington, D.C., Pilchen had served on the defense team for Caspar Weinberger during Iran-contra, but what was happening in the Miller case was new for him. "It was my first experience with the blog culture," he told me. "It was astounding to me how little constraint the bloggers had. They were passing off speculation as fact, and it read to me like pure character assassination."

According to Miller, the Huffington piece was not only mistaken but also possibly libelous. The Web site, though still in its infancy, had been steadily gaining heft. The Greek-born Huffington had an internationalist's shrewdness and realized that the digitally savvy went after information with a different sensibility. Her blog had become must reading for the media—a tangle of opinions, facts, and pseudofacts.

The blog set the stage for many in the press to find it difficult to defend Miller for protecting sources. When it was revealed that there were murky areas surrounding Miller—like the later-revealed notes of the June 23 meeting—her inability to shed the blogs' allegations undermined her. By late July a smog had descended on the crux of the case—protection of the press—and the blogs seemed to certify what had been speculated for weeks by Miller's critics.

Pilchen had with him a packet of press clips from the *Times.* "I want you to know what is happening out there. It is not all favorable. I don't want you to be upset," he said, handing Miller a copy of the Huffington Post clip.

Pilchen and Bennett were in the middle of a complex legal strategy to get Miller out of jail. But she was adamant that Libby would have to tell her personally that he wanted her to testify. The issue hinged on a blanket waiver that Libby and other government officials had signed. According to Abrams, "I was receiving mixed signals. On the one hand, Joseph Tate [Libby's lawyer] said it was O.K., and on the other he said that the document Libby had signed saying that journalists ought to cooperate was coerced. The message was blurry." Tate told me, "There were no negotiations. I did not equivocate. I said very carefully that Libby had signed that waiver. Period."

At first Pilchen, Bennett, and Abrams were not too concerned. Though much of what was appearing on Web sites such as the Huffington Post and Daily Kos excoriated Miller and her motives, scores of editorials had been published, from Lahore to Melbourne, calling her a heroine, and letters arrived by the thousands.

"No one takes this stuff seriously, do they?," Abrams said he asked *New York Times* lawyer George Freeman about the blogs.

"We must not give it any credence," Freeman said.

"But part of what we do is try to build public support for our client," Pilchen told me. And how could they do that when the uproar coming from the blogosphere drowned them out? For every one of their arguments, there was a counter-argument. Playing by the outmoded rules of the MSM, however, the lawyers seemed to be losing in the court of public opinion. "Everywhere I went, someone would ask me a question about the case, and it became obvious to me that what they were taking as truth was the defamation that was running on the blogs," Abrams said.

Inside *The New York Times,* reporter David Barstow was also feeling the effect. "People would come up to me and say, 'Is this true?' They knew I was close to Judy, so I became the one who would say that this or that blog was complete and total crap. I had to sit and explain how unlikely it was that Judy was the source, and I was struck by the power the blogs had over this place internally." Affable and outgoing, Barstow at 43 was an investigative reporter, and he and Miller shared a cubicle. On his first day in the investigative unit, he had noticed that the desk assigned to him had been commandeered by Miller for the overflow of her papers and books. "You don't think I am going to give this up, do you?" she had snapped at him, but Barstow made a joke of it, and soon the two forged a deep bond based on their shared capacity for grueling work. He was in frequent communication with Lowell Bergman, who had grown alarmed at the level of rage directed at Miller. The criticism of her W.M.D. reporting was obscuring what for Bergman and Barstow was the real concern: the threat to the press if it did not hang together and resist being used by prosecutors.

I was often on the telephone with Bergman that month. We had met in 1995, when he was a CBS producer and I was reporting on Jeffrey Wigand, the highest-ranking executive to come forward as a whistle-blower in the tobacco industry. Back then, Bergman warned me, "Unless you are prepared to go to jail, do not put any names on any of your notes. People's careers are in danger." Since then, Bergman has left CBS for

*The New York Times* and PBS's *Frontline.* Like Barstow, he was concerned over the situation inside the paper: "There were three problems. First, the entrenched hatred of Judy, which made her role as the focal point questionable. Second, people at the *Times* appeared to be talking to Huffington. Third, Judy and the W.M.D. and the manipulation of the media had taken precedence over the legal issue. For those of us who supported the principle, any future weakness in her story could undermine her." It had become clear, he said, that Huffington's idea that Judy was a key to a White House conspiracy "was a fantasy fed by the deep animosity of people toward Judy.... It was a surrogate for what they all wanted to do to the Bush administration."

All during the year before Miller went to jail, she and Barstow had discussed the implications of her decision for the press in general. Russert and Pincus avoided talking to Fitzgerald but later yielded. "Every time a deal like that is made, by a Tim Russert or a Walter Pincus or a Bob Woodward—the absolute gold standard—it makes it that much harder for the police reporter in Portland, Oregon, to say no when the local D.A. says, 'Turn over your notes,'" Barstow told me. "Now the D.A. can go right to court and say, 'NBC thought it was O.K., *The Washington Post* thought it was O.K., Bob Woodward thought it was O.K. Who are you on *The Oregonian* to think it is *not* O.K.?'"

Soon after Miller went to jail, Woodward appeared on *Larry King Live.* He said that he was opposed to the idea of casting a "kind of dragnet for all reporters who apparently showed up on phone logs or something like that," and that he, like Miller, would be willing "to stand on this principle of trust." He said Fitzgerald was "just chasing every reporter possible, to see who might know, even somebody who didn't write a story about this." He continued, "If the judge would permit it, I would go serve some of her [Miller's] jail time, because I think the principle is that important, and it should be underscored. It's not a casual idea that we have confidential sources. It is absolutely vital. And I'll bet there are all kinds of reporters out there, if we could divvy up this four-month jail sentence—I suspect the judge would not permit that, but if he would, I'll be first in line."

Woodward left out one crucial fact. Information about Plame had been made known to him two years earlier. His show of journalistic solidarity would come to haunt him when knowledge of his failure to tell Len Downie became prime meat on a myriad of Web sites and blogs.

Not long after Woodward's appearance on *Larry King Live,* William Safire testified before a congressional hearing on a federal shield law: "I am seething inside because I cannot tell you—with no holds barred—what I think of the unchecked abuse of prosecutorial discretion.... The reason is that I am afraid of retaliation against ... Judith Miller." The hearing, however, was televised only on C-SPAN3, so Safire's statement made little impact.

The day I went to see Miller in jail, she said, "The first person I wanted to come see me was James Risen [the *Times* national-security reporter involved in the Wen Ho Lee case]. I want Jim to see that going to jail is a reality."

From Arlington, I called Joe Wilson and asked if he would see me. "Yes," he said. "When can you get here? Will you be bringing a photographer?" There was a large American flag above his garage. Wilson answered the door barefoot, wearing Bermudas, and remarked upon that day's revelation in the *Post.* "I don't pretend to be an expert, but I agree with reporters who say that if the source burns you by offering up something that is bogus you have no responsibility to protect that source," he said. "Patrick Fitzgerald called me very early in the case. I sat with him for hours. I told him everything that had happened to me and to Valerie."

On September 29, Miller was released from jail, and the next day she testified before the grand jury that Libby had been her source. A month later, Libby was indicted for obstructing justice and lying to the F.B.I. and the grand jury. Wilson was with *60 Minutes* correspondent Ed Bradley, who was filming him for a segment on Valerie Plame, who has never commented publicly about the case. "Fitzgerald laid it out perfectly," Wilson told me in January. "A senior official of the United States government obstructed justice. It was only because they decided they would engage in an extended character-assassination campaign that this had gone along for the last two years. And it would have succeeded if it had not been for the law of compromising the identity of a C.I.A. operative. [Otherwise] they would have completely destroyed me. But we are a nation of laws. It was wrong to leak Valerie's name, and it was wrong to engage in wiretapping about national security."

**December 6, 2005, Boston**
It was six a.m. at Logan airport. Bob Woodward sat at a Formica table outside a Wendy's, which was not yet open, and from a crumpled plastic shopping bag took out a thick stack of newspapers. From a distance, he looked like a character from another era, graying and hunched, while all around him young professionals were working their laptops, listening to iPods, or watching CNN. Woodward was the only person reading a newspaper.

For several weeks Woodward had been chastised for not revealing to his editor that information about Valerie Plame had also been shared with him. *Times* columnist Frank Rich scolded him as well for his failure in *Plan of Attack* to include "any inkling of the disinformation campaign built to gin up this war." The surprise late entry of Woodward into the morass had tipped Plamegate into a new zone, muddying Fitzgerald's case by making it seem that there had been no concerted attempt to undermine Wilson. At home watching Fitzgerald announce the indictment of Libby, Woodward realized that "I knew something," he later told me. "When I heard the time line, I knew that I had heard the information from someone else several weeks earlier." Woodward had appeared on *Larry King Live* to try to explain: He said he had called his source, thought to be Dick Armitage, who had immediately gone to Fitzgerald to tell him of their conversation. Woodward followed, and soon Fitzgerald convened a new grand jury, to extend his investigation. Woodward had said that he kept the information secret in order to avoid getting a subpoena. "When all these reporters are close to going to jail, Woodward is trying to avoid a subpoena?" one anchorwoman

commented at a dinner in November for the Committee to Protect Journalists. On *Meet the Press*, when Tim Russert asked David Broder what was happening at the *Post*, Broder replied, "Consternation, to be honest with you." Russert's silence about his own role has elicited considerable comment and criticism on the blogs. Russert, who is married to *V.F.* special correspondent Maureen Orth, later told me that he had been bombarded with requests for interviews, and that he had made the decision not to comment publicly. At times, the complexities of reporters' commenting on one another's behavior had the feel of a taffy pull as friends wrote about friends while trying to exhibit detachment.

On December 5, Bernstein and Woodward had appeared at a forum on anonymous sources moderated by Alex Jones, the director of Harvard's Shorenstein Center. Bernstein, a longtime friend, had alerted me that the forum was taking place, and by chance we were on the same shuttle to Boston. "Have you been Googling this thing every day? The Norwich, Connecticut, [*Bulletin*] editorial page, of all places, has said that Bob should resign from the *Post*. I would like to know the page-one stories *they* have broken." He was rereading a piece he had published in 1992 in *The New Republic* on the subject of infotainment and the growing lack of news standards, and he was appalled, he said, that once again the White House had managed to change the subject. "They have made the press the very center of the drama, instead of what it is—trying to hide the fraud that was the selling of the war."

Onstage at the forum, Woodward at first looked apprehensive and melancholy, as gray as the gargoyles he and Bernstein had once unseated.

"Can you imagine a situation in which you would give up an anonymous source, promised confidentiality, against his wishes?," Alex Jones asked.

"I cannot," Woodward replied. "Those sources are a lifeline.... If they feel nervous ... if the environment is one of risk, they won't [come forward]."

'This thing is going to turn out to be a cul-de-sac," Bob Woodward said. I was on a plane back from Boston with him. "It is going from here to there and back to here," he said, running his finger across the seat in front of him. He and Bernstein were having an ongoing dispute. "Carl thinks that Fitzgerald and his investigation into a White House cover-up is the crucial issue. I disagree. What is crucial is the war, the ongoing casualties, the debate about what to do! The evidence! The rest of the country does not care about Fitzgerald—they think Fitzgerald is the author of *The Great Gatsby.*"

I asked Woodward if he had been in favor of the war. "I don't take a position," he said. "I never have. People in New York and the *Washington Post* editorial page were all in favor of it. Now they are opposed. It validates my point. I don't write editorials. I could see the arguments. I know what wars do. I was on a naval cruiser during Vietnam.... Paul Wolfowitz said it in *Vanity Fair*: 'You needed a vehicle.' The vehicle was W.M.D."

I asked him if he would still go to jail for Judy Miller. "I don't know what to think anymore," he said. "It has become murky for me. I know that if you start criminalizing the exchange of information people will no longer speak to you. Your sources will dry up. I should not talk to you. Because I have now testified in the case, my lawyers tell me, 'You cannot talk about this.' Someone is going to haul it out. My position is: Over my dead body. The lawyers told me, 'Do not do the thing up at Harvard.' I have a strong belief that you do not hide. It is critical. If you are going to be a reporter, then there is an obligation to speak. We cannot take a step down the road of not speaking."

I asked him about his meeting with Fitzgerald. "I told him that I noticed in his press conference that he had said, 'Truth is the engine for the business of journalism.' I repeated that remark to Fitzgerald, and he seemed to look at me with a real understanding." There was no hint of irony in Woodward's voice. I asked him if he was concerned about the chilling effect on the press. "Of course," he said. "What is going on creates a terrible precedent. No one knows how any of it is going to come out."

*Ms. Miller ... acknowledged serious flaws in her articles on Iraqi weapons. "W.M.D.—I got it totally wrong," she said. "The analysts, the experts, and the journalists who covered them—we were all wrong. If your sources are wrong, you are wrong. I did the best job that I could."*
—*The New York Times*, October 16, 2005.

Out of jail, Miller resigned under pressure from *The New York Times* and began making speeches around the country on the need for protection of anonymous sources and a national shield law. Meanwhile, her former colleague James Risen was at the center of a new leak investigation, with his front-page stories and book on warrantless wiretaps and the Bush administration's alleged violation of a foreign-intelligence act in monitoring the lives of Americans.

In December, I had arranged to meet Walter Pincus in the lobby of *The Washington Post*. Pincus was late, and when he came downstairs he apologized. "I was in the middle of this new domestic-spying story," he said. This was just days before Risen's investigation would break in the *Times*. As we crossed 15th Street to have lunch at the Madison, Pincus said, "There are reports that this administration is involved in the most comprehensive abridgement of court proceedings, using the N.S.A. to raid and spy on Americans without legal warrants." At the table, I asked Pincus: How did we get from there to here? He began with Bush and Cheney's decision to go to war in 2003. "The question was why. They said, 'You have to go to war because Saddam Hussein is not in a box and is a threat. He had weapons!'" Now it was conceivable that Risen and *The Washington Post*'s Dana Priest, whose article on the secret C.I.A. prisons known as "black sites" had prompted calls for another leak

investigation, would be forced to go to jail.

"Every future Patrick Fitzgerald out there will see that coercion worked," David Barstow remarked.

*Lawyers for Vice-President Dick Cheney's former chief of staff told a federal judge on Friday that they would seek to subpoena reporters and news organizations to obtain additional documents that could assist in his defense in the C.I.A. leak case. —The New York Times, January 21, 2006.*

B y early 2006 it had become obvious to Eve Burton, the general counsel of the Hearst Corporation, that Barstow's dire prediction had come true. "What has been the effect of Plamegate for the Hearst newspapers and TV and radio stations?," I asked her. "Troubling," she said quickly. "From July to December we had 42 subpoenas, eight times the number we got in the same six-month period last year." Burton, who is one of the only general counsels of a media corporation with a First Amendment background, has been bothered by the language in the court cases and filings. "They either invoke the Plame case or they say that now all the rules have changed." For Burton, there is no question that Fitzgerald's tactics and the decision in Judge Posner's court have emboldened federal and state prosecutors all over the country. "It is clearly a political decision coming out of the Bush Justice Department to go after the press in this country," she said. "In our 42 subpoenas, they will come after anything and everything—B roll at the TV stations, for example. Basic general-assignment reporting. A call will come in from the government: 'I understand you took footage of Joe Blow!' And the reporter at a station, usually inexperienced, will say, 'No, we did not take any footage.' Then we will end up having fights in court with the prosecutor about what constitutes a waiver." The subpoenas at Hearst, Burton continued, involve broadcast stations and newspapers all over the country. Is there a pattern? "Typically, it is non-published and confidential material. This is the danger of making the press the investigative arm for the government." At Hearst, Burton has created a "subpoena task force"—fighting every subpoena of non-published or confidential material, no matter how seemingly minor. "At one point, I was in a position where we had four subpoenas for one afternoon, and I could not even figure out how to be able to litigate them in the same time period," she said. "There are instances where both sides are subpoenaing the reporter, and the court will say, 'You have to testify immediately,' and it is too late to argue in front of the court that day, so reporters are threatened with having to spend the next night in jail."

Within the *Times,* Barstow and every reporter who had ever worked with Judy Miller were braced for a flurry of subpoenas from Scooter Libby's legal team, in search of material that would exonerate him. It had become clear to Barstow and Lowell Bergman that Fitzgerald's mission and the agenda of the progressive left had set off a much greater problem for the press. Barstow was also concerned about *The Washington Post*'s fight for reporter Dana Priest. "She is a national treasure," he told me. "The left loves this story. She revealed the black sites and the secret prisons. Now she is in much graver danger of going to jail for 85 days."

Does Eve Burton blame Fitzgerald? "I don't blame him," she said. "He has a job to do, and he has done it. Fitzgerald would say that after *Branzburg* the press has had 30 years of a free ride. The media has taken its responsibility to fight these subpoenas too loosely. When we were fighting every single battle, we were doing better. Then we went through a time when we started to make deals. When you start making deals, you empower people to come after you. It is as simple as that."

Some months ago, Bergman, alarmed at the trend, stopped keeping records of conversations with sources who in talking to him might have broken a law. "There were people who could have drawn the line, like Tim Russert and Bob Woodward, by framing the public debate so people would have understood what was happening. Nice, lovable Tim Russert in jail? Bob Woodward of Watergate fame could have come forward and said, 'This is important.' When Fitzgerald's subpoenas started flying, the only solidarity after the first fights was how do I shilly-shally and get out of this? The problem is, it didn't work."

B y February there was a strong indication of what many had suspected all along: the effort to sell the war had begun in the office of the vice president. Writing online in the *National Journal,* Murray Waas, citing "attorneys familiar with the matter" and court records as his sources, broke the story that Scooter Libby had testified that he had been empowered by his boss, Dick Cheney, and other superiors to release classified material "to defend the Bush administration's use of prewar intelligence in making the case to go to war with Iraq." However unethical that might be, it was not a violation of the Intelligence Identities Protection Act. It did, however, point to a craven plot to attempt to spin reporters. There was speculation that Libby's defense team, which includes John Cline, who represented Oliver North in the Iran-contra case, might be returning to a strategy used then, trying to prove that, whatever Libby did or didn't do, his orders had come from above. On February 23, Libby's lawyers tried a further strategy, arguing that the indictment be dismissed because Fitzgerald was not appointed by the president with the Senate's approval—as per the Constitution—but by the Justice Department. By then, the two key figures in the case—Novak and Plame—were all but forgotten. In December, Plame had resigned from the C.I.A.

What had started as an F.B.I. investigation into the Bush propaganda machine had somehow morphed into a time of danger for the press. C.I.A. director Porter Goss demanded that reporters be put in front of a grand jury for the most recent leaks. "To envelop this in a national-security patina is chilling to reporters," James Goodale said. "If this happens, it's the end of this kind of reportage. You end up in jail because you are the only witness." Floyd Abrams concluded, "The consequence will be to threaten journalists' ability to do their job."

*Marie Brenner is* Vanity Fair's *writer-at-large. Her February 2001 article, "In the Kingdom of Big Sugar," is now being made into a motion picture,* Sugarland, *directed by Jodie Foster.*